# EXHIBIT E

BLANKROME

One Logan Square
130 North 18th Street |Philadelphia, PA 19103-6998

Phone: (215) 569-5624
Fax: (215) 832-5624
Email: joseph.poluka@blankrome.com

June 26, 2026

**By Email**
Matthew Phelps
U.S. Attorney's Office for the District of Maryland
36 S. Charles Street
Suite 400
Baltimore, MD 21201

Re: Response to Letter Regarding Purported Potential Conflicts of Interest

Dear Mr. Phelps:

We write in response to your letter dated June 16, 2026, in which the Government raised concerns regarding potential conflicts of interest relating to Blank Rome's representation in this matter. As set forth below, none of the asserted potential conflicts is supported by the law or the facts.

While we are prepared to vigorously defend against any motion to disqualify our attorneys, we would appreciate the opportunity to discuss any of the Government's remaining concerns before any court filings are contemplated.

## I. Blank Rome Attorneys Were Not Witnesses to Charged Crimes and a Motion for Disqualification Would Be Highly Inappropriate.

The Government's contention that Blank Rome was a witness to charged crimes and caused the production of false documents is beyond misguided—it is extreme. If true, the Government's arguments would require the disqualification of defense counsel in countless cases across the country. Your position also would deprive the Synergy Defendants of their counsel of choice, not to mention that it would be prejudicial, given that Blank Rome has been involved in this matter since March 26, 2024.

### A. Blank Rome Attorneys Were Not Witnesses to Charged Crimes.

"An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). Blank Rome attorneys did not have the knowledge required under the case law. Nor did Blank Rome represent Karthik Nair or [redacted] so there was no

attorney-client relationship in place. Moreover, the relevant NTSB interviews were recorded and transcribed, eliminating any risk of Blank Rome attorneys being impaired by Mr. Weigel's presence. Mr. Weigel, therefore, was no more a witness than any other attendee and could not testify to anything that was not in the documented record. Comparably, the production of hundreds of thousands of records within our clients' possession, custody, and control does not somehow implicate Blank Rome in the purported crimes, particularly given that the few records at issue were produced *before* the Government first alleged they were false.

### B. The Government Has Not and Cannot Meet the High Bar Required for Disqualification.

Attorney disqualification is a "drastic remedy" that "should be a measure of last resort." *Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 469 F.3d 18, 23 (1st Cir. 2006); *see also United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986). Accordingly, "the government bears a heavy burden of establishing that disqualification is justified." *Id.* Indeed, in *Locascio*, the notorious defense attorney in question was defined by the court as "house counsel" to the Gotti crime organization, such that he was "a potential accomplice as well as a potential witness to Gotti's tax fraud" (*a far cry from Blank Rome's representation of the Synergy Defendants*), and, still, the court did not rush to disqualify. 6 F.3d at 932.

In deciding a motion for disqualification, courts recognize a presumption in favor of the accused's chosen counsel, although this presumption can be overcome by a showing of an actual conflict or potentially serious conflict. *Id.* at 931 (citing *Wheat v. United States,* 486 U.S. 153, 164 (1988)); *see also United States ex rel. Stewart v. Kelly*, 870 F.2d 854, 856 (2d Cir. 1989)). Indeed, prosecutors have an affirmative duty not to circumvent the protection afforded by the right to counsel. *United States v. Joyce*, 311 F. Supp. 3d 398, 404 (D. Mass. 2018) (citing *Maine v. Moulton*, 474 U.S. 159, 171 (1985)). And courts have considered attempts to call a defense attorney as a witness against his client as governed by the "best evidence rule." *Id.* (citing *United States v. Hallock*, 941 F.2d 36, 44 (1st Cir. 1991)) ("Where the government's proffer of a defense attorney's testimony will force the attorney's removal, the government may only call the attorney as a witness if, without his or her testimony, the government must settle for less than its best evidence").

For the reasons set forth below, the Government cannot overcome the presumption in favor of the Synergy Defendants' chosen counsel, as there is no actual conflict or even a potential serious conflict. We are confident that the Court would reach the same conclusion.

### C. Severance Would Nullify Many of the Government's Concerns.

The Government's letter repeatedly expresses concern that Blank Rome attorneys could be called as witnesses and that our performance as advocates may be impaired by our involvement in the NTSB interviews, [redacted] deposition, and the production of allegedly false documents. Many of these concerns would be nullified if the Synergy

Defendants' case were severed from Mr. Nair's; yet your letter omits any reference to the fact that the Synergy Defendants advised on June 12 that we intend to file a motion for severance and then repeated that fact during the status conference.

## II. Blank Rome Did Not Represent Either Karthik Nair or [redacted] in their NTSB Interviews and the Government Is Not Entitled to the Production of Privileged Communications or Blank Rome Attorney Work Product.

### A. Blank Rome Does Not and Has Never Represented Either Mr. Nair or [redacted]

Blank Rome represents the Synergy Defendants—it does not and has not served as counsel to any of their employees or agents in an individual capacity. This is true with respect to all aspects of our representation, including the proceedings before the NTSB.

NTSB regulations prohibit counsel—in-house or outside counsel—from serving as a "party representative" in an investigation. 49 C.F.R. § 831.61(a)(4). Individuals who are interviewed by the NTSB during the course of an investigation are entitled to be accompanied by a "representative" and that representative *may* be an attorney and *may* provide support and counsel to the witness, but *may not* supplement the witness's testimony or advocate for the "interests of a witness's other affiliations" (*i.e.*, his or her employer) during the hearing. *See id.* § 831.57(a) (emphasis added). In practice, and particularly with respect to foreign witnesses, the NTSB often permits counsel for the witness's employer to be the "representative" under § 831.57(a). This was the case here.

While Alan Weigel attended the NTSB's interviews of Mr. Nair and [redacted] as their "representative" under § 831.57(a), he was not engaged as their counsel and did not provide any legal advice. Mr. Weigel was there merely to lend support to employees/agents of the Synergy Defendants caught up in unfamiliar legal proceedings in a foreign country. The interview transcripts show that Mr. Weigel did not say anything during either interview. In fact, the NTSB interviews were conducted via Teams and Mr. Weigel participated from the United States, while the witnesses participated from India. His role in the interviews was limited to paying attention for any inappropriate questions and taking notes of the interviews.

Moreover, Blank Rome was only *minimally involved* in preparing witnesses for NTSB interviews. For context, the NTSB interviewed Mr. Nair and [redacted] just two months after the allision, and Blank Rome was still conducting an internal investigation on behalf of our clients. Blank Rome's "witness preparation" was limited to explaining what NTSB interviews entail and who would be on the call, and providing some best practices for answering questions – *e.g.*, answer *truthfully*, respond only to the question that is asked, request that the interviewer repeat the question if you do not understand it, etc.

Beyond the interviews themselves, every time we met with Mr. Nair, [redacted] and any other employee or agent of the Synergy Defendants, Blank Rome counsel provided a clear *Upjohn* warning. Our records reflect that Blank Rome attorneys only conducted one substantive interview of Mr. Nair and [redacted] prior to their NTSB interviews and that there were no direct emails with either individual—only emails to groups of Synergy personnel relating to requests for documents on which they may have been copied.

Thus, neither Mr. Weigel nor any other Blank Rome attorney can be characterized as a "witness to charged crimes" in line with the case law requiring disqualification. While he attended the NTSB interviews, Mr. Weigel had no way of knowing the truth or purported falsity of the witness's statements. Indeed, Blank Rome was not aware of any concern with respect to the witness interviews until the Government first alleged that Mr. Nair and [redacted] had made false statements. Any concern about Blank Rome being impaired by Mr. Weigel's involvement with the NTSB interviews is also negated by the fact that the interviews were video recorded and transcribed by a court reporter, removing any concern about being required to call Mr. Weigel or any other Blank Rome attorney as a witness at trial.

Relatedly, while Blank Rome knew that the use of the flushing pump was central to the Government's PWSA allegations when the NTSB interviews occurred, we did not learn about the allegations regarding the VCB and ACB certificates until the Government raised that issue during its June 2025 reverse proffer. As the Government hopefully is aware, there was no technical problem with the VCBs and ACBs – they functioned properly and as-designed on March 26, 2024. Therefore, there was no reason to drill down into their inspection or maintenance. Indeed, the NTSB investigation did not focus on VCBs and ACBs and the NTSB asked only one question regarding the inspection certificates during Mr. Nair's interview.

**B. The Crime-Fraud Exception Is Not Applicable and Blank Rome's Client Communications and Attorney Work Product Relating to Meetings with Mr. Nair and/or [redacted] Are Not Discoverable.**

The attorney-client privilege exists to encourage full disclosure of pertinent information by clients to their attorneys. *Upjohn Co. v. United States,* 449 U.S. 383 (1981). Its protection extends to past criminal violations because the client has a legitimate interest in securing informed representation without fear of forced disclosure. However, the client has no legitimate interest in seeking legal advice in planning future criminal activities. The crime-fraud exception therefore comes into play only if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *In re Murphy,* 560 F.2d 326, 337 (8th Cir. 1977) (citations omitted).

The crime-fraud exception to the attorney-client privilege holds that communications made between an attorney and his client, ***for the purpose of furthering the commission of a future or present crime or fraud***, are not protected from disclosure by the attorney-client privilege. The purpose of this exception is to assure "that the seal of secrecy between lawyer and

BLANKROME



client does not extend to communications made for the purpose of ***getting advice for the commission of a fraud or crime***." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (emphasis added).

In *In re Grand Jury Proceedings #5 Empaneled January 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) the Fourth Circuit stated:

> Specifically, we have held that the party invoking the crime-fraud exception must make a prima facie showing that (1) the client was ***engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme***, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud. Prong one of this test is satisfied by a prima facie showing of evidence that, if believed by a trier of fact, would establish the ***elements of some violation that was ongoing or about to be committed***. Prong two may be satisfied with a showing of a ***close relationship between the attorney-client communications and the possible criminal or fraudulent activity***.

(internal citations omitted) (citing *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir. 1999); *In re Grand Jury Investigation,* 842 F.2d 1223, 1226 (11th Cir.1987); *In re Sealed Case,* 676 F.2d at 815; *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir.1982)) (emphasis added).

The Government cannot merely allege that it has a "sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney." *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996). Rather, the district court must find "reasonable cause to believe" that the attorney's services were "utilized . . . in furtherance of the ongoing unlawful scheme." *Id.* (quoting *In re Grand Jury Proceedings (John Doe)*, 867 F.2d 539, 541 (9th Cir. 1989). Cases considering and applying this "rare" exception apply (a) only where there is an actual attorney-client relationship between the parties; (b) where the charged criminal activity was anticipated but not completed at the time a client engaged counsel; and (c) that the engagement of such counsel was done with the intent of the client to engage in or attempt a criminal activity. None of those elements is present here.

The Government has no evidence whatsoever to establish that Mr. Nair or [redacted] sought the advice of Blank Rome attorneys to further a criminal or fraudulent scheme. Setting aside the fact that Blank Rome has never represented either of these individuals and did not prepare them for their NTSB interviews, Blank Rome was jointly engaged by Grace Ocean and Synergy Marine in connection with the NTSB investigation and Limitation Action ***immediately after the allision***, well before the Government's criminal investigation began. Blank Rome was later engaged to represent Synergy Marine in the criminal investigation and Collier Walsh Nakazawa was engaged to represent Grace Ocean, in order to avoid even a remote possibility of a conflict of interest between manager and owner. Thus, the Government cannot

show that Blank Rome was engaged for the purpose of furthering the commission of a present or future crime.

Comparably, even assuming the Government has "some evidence" that Mr. Nair and/or [redacted] NTSB testimony was false (which we dispute), it has not even remotely demonstrated the kind of connection between Blank Rome's communications with the Synergy Defendants and the allegedly false statements that would be required to establish the crime-fraud exception. It cannot do so and, therefore, is not entitled to disclosure of any privileged communications.

The Government appears to claim (wrongly) that it is entitled to Blank Rome attorney work product, which would require you to demonstrate that Blank Rome *knew* about the purportedly false statements or *knew* that Mr. Nair and/or [redacted] supposedly were participating in a scheme to make false statements. *See, e.g., In re Grand Jury Proceedings #5*, 401 F.3d at *252. We strenuously disagree with any such assertion and are confident that the Government is not entitled to any attorney work-product.

**C. There Is No "Advice of Counsel" Defense Available.**

The Government's purported concern about Mr. Nair potentially raising an "advice of counsel" defense at some unknown point in the future is speculative at best.[1] To our knowledge, Mr. Nair has not been served. Nor are we aware whether the Government is even taking steps to do so, let alone to extradite him.

Mr. Nair could not reasonably invoke an "advice of counsel" defense with respect to any his interactions with Blank Rome, including regarding the NTSB interview. As explained above, Mr. Nair was given an *Upjohn* warning in every meeting with Blank Rome and Mr. Weigel did not provide any substantive legal advice to Mr. Nair (or [redacted] for that matter) upon which he could claim to have relied in making statements to the NTSB. Moreover, Mr. Nair has independent counsel, whom we assisted in securing when it became clear that he might have potential exposure in this matter because Blank Rome does not and has not represented Mr. Nair individually.

**III. <u>Blank Rome Did Not Represent [redacted] in his Deposition and the Government Is Not Entitled to Production of Privileged Communications or Blank Rome Attorney Work Product.</u>**

Outside counsel for a corporation is permitted to defend that company's employees at a deposition and does not represent the employees in an individual capacity. *See, e.g., In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir. 1982) ("Lawyers . . . must be able to seek information

[1] The Government's letter does not express this concern regarding [redacted], presumably because he has not been charged with any crimes. Any assertion that [redacted] could, if charged, raise an advice of counsel defense would fail for the same reasons.

from employees at every level of the corporate entity concerning matters which may entail legal problems for the corporation."); *Coleman v. City of New York*, No. 98-8761, 199 WL493388, at *1-2 (S.D.N.Y. July 8, 1999) (deposition preparation between employees of the New York City Departments of Investigation and Health and counsel for the departments was protected by privilege).

[redacted] deposition transcript clearly lists Mr. Bennett as representing "Vessel Interests," *i.e.*, Synergy Marine and Grace Ocean, not [redacted] While Blank Rome attorneys prepared [redacted] for his deposition, such preparation was in furtherance of our representation of the companies. Also, our records reflect that there were no direct written communication with [redacted] regarding his testimony. In short, Blank Rome communications relating to the deposition, including any on which [redacted] is copied, are protected by Synergy Marine and Grace Ocean's attorney-client privilege.

The Government's claim that [redacted] deposition testimony "is evidence" also is baseless. Your argument assumes that [redacted]'s testimony was false, but that is far from established. And, by the Government's own admission, the deposition is not a charged event (nor could it be). Instead, the testimony is a statement by an individual who is not charged in the Indictment that was made after the alleged crimes occurred. Thus, it is entirely unclear how the Government intends to use the testimony as evidence – particularly when there is a transcript of the NTSB interview memorializing the allegedly false statements. At best, the Government could use the deposition testimony for impeachment purposes if [redacted] were to be called as a witness at trial.

The contention that Mr. Bennett and other Blank Rome attorneys' advocacy may be impaired by their participation in the deposition also lacks merit for the same reasons. Accordingly, the Government is not entitled to disclosure of any privileged communications.

To the extent the Government contends Blank Rome counseled [redacted] to provide false deposition testimony (which is unclear from your letter) and that the Government is entitled to disclosure of attorney work-product, we vehemently reject that contention.

**IV. <u>Blank Rome's Production of Records within the Synergy Defendants' Custody and Control in Response to Requests from NTSB or Grand Jury Subpoenas Does Not Create a Conflict of Interest.</u>**

The Government contends that the VCB and ACB inspection certificates and open-up inspection certificates are false and that, by virtue of producing these allegedly false documents to the NTSB and the Grand Jury, Blank Rome was "involved" in or "caused" crimes to occur. This argument fails.

The Government's theory collapses under the relevant timeline. As the Government is well aware, the allegedly false VCB and ACB certificates date back to Spring 2020 and the

allegedly false open-up inspection certificates were created in March 2023. There is no allegation – nor any evidence – that these documents were created or altered for production in response to NTSB document requests or Grand Jury subpoenas. Yet the Government contends that Blank Rome became a "witness" to alleged falsification simply by producing documents that predate its representation by years.

Notably, both the NTSB and the FBI/DOJ obtained copies of the allegedly false certificates prior to any production of documents made by Blank Rome. The transcript of Mr. Nair's NTSB interview reveals that copies of the inspection certificates were zip-tied to the circuit breakers when NTSB boarded the *M/V DALI* after the allision. To our knowledge, and based upon available documentation, the certificates had been there since at least January 2024 during a charterer's inspection and were not "presented" to the NTSB. In addition, the FBI independently seized the records from the Vessel during the execution of the search warrant in April 2024.

While Blank Rome assisted the Synergy Defendants with the collection, review, and production of records, including the inspection certificates, all such records were both responsive to the relevant requests and in the clients' possession, custody, and control, and were therefore required to be produced.[2] Indeed, had we instructed our clients not to produce the records, the Government would have accused us of obstructing its investigation.

The Government's position is untenable. Assisting the Synergy Defendants in responding to NTSB document requests and Grand Jury subpoenas did not transform Blank Rome attorneys into fact witnesses. Moreover, even if the inspection certificates were false, which we dispute, the Government cannot demonstrate that the Synergy Defendants engaged Blank Rome for the purpose of submitting false documents to the NTSB and/or Grand Jury and thus the crime-fraud exception does not apply.

## V. <u>The Timing of the Government's Notice of a Potential Conflict is Questionable.</u>

The Government focuses on its obligation to raise potential conflicts of interest with the court "as early as possible" and, as such, insisted on addressing your claims during the status conference on June 16; however, you have been aware of all of the facts contained in the letter for quite some time. You have known about Blank Rome's role in the NTSB interviews since they were conducted. Blank Rome produced the VCB and ACB certificates to the NTSB over two years ago and to the Grand Jury about 20 months ago. And, at a minimum, all of the allegedly unlawful conduct was known to the Government at least as early as June 2025, because it was included in your reverse proffer. To this end, we question your timing and remind you

---

[2] The scale of production further undermines the Government's theory. The Synergy Defendants produced more than 350,000 documents (over 1.5 million pages) in response to 17 Grand Jury subpoenas, along with numerous voluntary productions.

that "the government may not infringe upon the right to counsel of choice to gain a tactical advantage." *Joyce*, 311 F. Supp. at 403-04 (citing *Diozzi*, 807 F.2d at 13–14).

Sincerely,

[signature]

BLANK ROME LLP

Joseph G. Poluka
Luke M. Reid
Kierstan L. Carlson
Alexandra Clark
Emma C. Jones
William R. Bennett, III

*Counsel for Defendants Synergy Marine Private Ltd. and Synergy Maritime Private Ltd.*

cc: Leigh Rende (by email)